IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**RACHEL MERGENS, and RAY ALVAREZ**
in their capacity as guardians
for A.P., a minor child,
60 Rosemont Avenue
Waltham, MA 02451

    *Plaintiffs*,

v.                                                          Case No. _____
                                                         **JURY TRIAL DEMANDED**

**BORGER MANAGEMENT, INC.**
1111 14th Street, NW, Suite 200
Washington, DC 20005

**Serve:  The Corporation Trust, Incorporated**
         2405 York Road, Suite 201
         Lutherville-Timonium, Md 21093-2264

And

**CP SARBIN TOWERS, LLC**
**CP INVESTMENT REIT,**
**CP INVESTMENT FUND – LIQUIDATION LLC,**
**CP INVESTMENT FUND, L.P.,**
**CARMEL PARTNERS GP, LLC,**
As Former Member/Manager/Owners Of
**SARBIN TOWERS II, LLC**
3132 16th Street, NW
Washington, DC 20009

**Serve:  Corporation Service Company**
         251 Little Falls Drive
         Wilmington, DE 19808

And

**CP EMPLOYER, INC.**
f/k/a **CARMEL PARTNERS, INC.**
t/a Sarbin Towers
3132 16th Street, NW
Washington, DC 20009

**Serve: Corporation Service Company**
 **1090 Vermont Ave NW**
 **Washington, DC 20005**

*Defendants*.

## COMPLAINT

COME NOW the Plaintiffs, Rachel Mergens and Ray Alvarez, in their capacity as guardians for A.P., a minor child, by counsel, and for their Complaint against (1) Borger Management, Inc., (2) CP Sarbin Towers, LLC, CP Investment Reit, CP Investment Fund – Liquidation LLC, CP Investment Fund, L.P., and Carmel Partners GP, LLC, as former member/manager/owners of Sarbin Towers II, LLC, and (3) CP Employer, Inc., f/k/a Carmel Partners, Inc. t/a Sarbin Towers, allege the following:

## PARTIES

1. Plaintiffs Rachel Mergens and Ray Alvarez were appointed as the duly appointed guardians for A.P., a minor child, on July 30, 2021 by the Middlesex Probate and Family Court. Rachel Mergens and Ray Alvarez are adult residents of the Commonwealth of Massachusetts.

2. A.P. is a minor child and a resident of the Commonwealth of Massachusetts.

3. Defendant Borger Management, Inc. ("Borger Management") is a property management firm incorporated in Maryland with its principal place of business located at 1111 14th Street, N.W., #200 Washington, D.C. 20005. Upon information and belief, Borger Management, Inc. directly or indirectly manages over 4,500 rental units in the Washington, D.C. metro area. Upon further information and belief, Borger Management directly or indirectly owns or manages approximately 60 apartment buildings in Washington, D.C. In September 2010, Borger Management directly or indirectly owned or managed a residential apartment building located at 3132 16th Street N.W. ("the Property").

4.      Sarbin Towers II, LLC ("Sarbin Towers II") was, from 2004 to 2013, a Washington, D.C. LLC that directly or indirectly owned or managed the Property, an eight-story, 63-unit residential apartment building located in the 3100 block of 16th Street in Washington, D.C. The Property was one of three apartment buildings owned or managed by Defendants in the Columbia Heights neighborhood of Washington, D.C.  Following the events giving rise to this claim, Sarbin Towers II was dissolved.  Defendants CP Sarbin Towers, LLC, CP Investment Reit, CP Investment Fund – Liquidation LLC, CP Investment Fund, L.P., and Carmel Partners GP, LLC, at all times relevant hereto, were members, managers, or owners of Sarbin Towers II, or were members, managers, owners, or partners of the member, manager or owner of Sarbin Towers II. These Defendants will be collectively referred to herein as "Sarbin Towers II" and are liable for Plaintiffs' claims against Sarbin Towers II pursuant to D.C. Code § 29-807.04 because the claimant did not receive notice of dissolution, the claim had not been sent to the company but not acted upon, and claimant's claim was not contingent at or based on events occurring after the effective date of dissolution.

5.      Defendant CP Employer, Inc., f/k/a Carmel Partners, Inc. t/a Sarbin Towers (hereinafter collectively referred to as "Carmel") is a foreign corporation organized under the laws of California and with its principal place of business in California. Upon information and belief, in September 2010, Carmel directly or indirectly owned or managed Sarbin Towers Apartments located at 3132 16th Street, N.W.

## JURISDICTION AND VENUE

6.      This Court may exercise personal jurisdiction over Defendants because they regularly conducted business in the District of Columbia at all times relevant herein, and this action arises out of Defendants' conduct within the District of Columbia.

7. This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332 because the plaintiffs and defendants are of diverse citizenship and the amount in controversy exceeds $75,000. Specifically, Plaintiffs are citizens of Massachusetts. Defendant Borger Management is a citizen of Maryland and Washington, D.C. Defendant Carmel is a citizen of California. Upon information and belief, none of the members, managers, owners, or partners of the entities identified in Paragraph 4 are citizens of Massachusetts.

8. Venue is appropriate because the acts and omissions complained of herein occurred in the District of Columbia.

## BACKGROUND AND FACTUAL ALLEGATIONS

9. A.P., an infant, age 4, lived at the Property in unit number 506 on the fifth floor (the "Apartment"), with her father ("Mr. P"), mother ("Mrs. A") and twin sister, K.P. Mr. P's cousin, Jorge Moran Miseal ("Mr. Miseal"), and Ivan Apaza Caseres Midwar ("Mr. Midwar"), a friend of the family, also lived with the family in unit 506.

10. A.P. and her family were residents in the Apartment and had been since her birth in 2006.

11. Defendants had actual or constructive knowledge that A.P. and her family resided in unit 506 of the Property.

12. Upon information and belief, Defendant Sarbin Towers II was the legal owner of the Property.

13. Defendants Carmel and/or Borger provided property management services, including but not limited to building engineering services and site maintenance, including maintaining the fire alarms and smoke detectors on the Property.

14. Defendants had actual or constructive knowledge that the smoke detectors within the Property did not work, in violation of the District of Columbia statutes and regulations (14 DCMR 904.4 and D.C. Code § 6-751.01 *et seq.*).

15. Defendants had actual or constructive knowledge that residents frequently and/or regularly discarded large, bulk trash items in the hallway common areas of the Property, in violation of the District of Columbia statutes and regulations (14 DCMR 905.3 and D.C. Code § 6-751.01 *et seq.*).

16. In the early morning of September 29, 2010, A.P. and her family were asleep in bed.

17. Mr. Midwar and Mr. Miseal had fallen asleep in the living room.

18. At some time before 3:30 a.m. on September 29, 2010, a fire ignited in the Property.

19. Upon information and belief, the fire ignited in the fifth-floor hallway, likely starting on or around a mattress and upholstered chair that were placed in the common area of the hallway outside of units 501 and 502 earlier that night.

20. At approximately 3:30 a.m., light from the fire under the front door of the Apartment woke up Mr. Midwar and he immediately alerted Mr. Miseal. By the time the light awoke Mr. Midwar, smoke was already flowing into the apartment.

21. Mr. Miseal began to scream and pound on the bedroom door, announcing that the building was on fire. The screams and pounding awoke Mr. P, A.P's father.

22. Confused and panicked, Mr. P quickly woke his wife and daughters. He picked up A.P. and Mr. Miseal carried K.P.

23. A.P.'s family, along with Mr. Miseal and Mr. Midwar, gathered in the kitchen and opened a window because the apartment had filled with smoke.

24. The Property was designed to be built, fitted and/or equipped as a sprinkler-free, fire-rated building with structural barriers such that smoke or fire in a hallway or common space would not invade into the individual apartment units, which would allow residents to shelter in place. However, due to the Defendants' failure to adequately maintain the doorway of the Apartment, smoke was able to invade into the Apartment, causing A.P. and her family to have to try to evacuate through the fire.

25. According to witnesses, at no point did any of the fire/smoke alarms or detection systems in the Apartment make a sound, even though the apartment had filled with smoke. Specifically, the fire/smoke alarms or detection systems located in the Apartment's bedroom, living room, and the outside hallway each failed to operate on the night of the fire. Had it not been for Mr. Miseal's screams and pounding, Mr. P would have remained asleep in the bedroom while smoke poured into the Apartment and the fire raged. Moreover, had the alarms functioned as intended, those in the Apartment would have been alerted of the fire much sooner instead of having to wait until Mr. Midwar was awoken by the intruding light of the already raging fire.

26. Defendants had historically undertaken to test and maintain the alarm system and knew or should have known that the residents of the building relied upon Defendants to do so.

27. While in the kitchen, A.P. began coughing incessantly as a result of the smoke intrusion, so Mr. P decided to try to evacuate the Property with her by exiting via the fifth-floor stairwell.

28. By this time, the hallway outside of the Apartment was engulfed in flames and the Property's fifth floor stairwell was nearly inaccessible.

29. Mr. P grabbed some towels and covered A.P. and his wife. When he first exited the apartment, he was carrying A.P. in his arms and slipped in the hallway, falling onto the burning floor. He then tried to run to the stairway door, and when he opened the door, he slid down the

stairway to the landing between the fourth and fifth floor. All this time, Mr. P was holding A.P. as he desperately struggled to escape the burning building.

30. Mrs. A, A.P.'s mother, also fell and struck her head, but she was able to help Mr. P to his feet. Together they struggled down the stairway with A.P. and were eventually able to descend to the lobby door.

31. Due to the failure of the Property's fire/smoke alarm/detection systems to operate properly, the Property had burned for at least a half hour on the 5th floor before Mr. P and his family became aware that the fifth floor was on fire.

32. Because no alarm sounded, crucial time was lost from the time the fire began until the time Mr. P was alerted of the need to leave the building to safety.

33. The 5th floor of the Property was catastrophically damaged by the subject fire as shown below:







34. Defendants failed to provide adequate precautions to ensure the safety of their residents. At the time of the September 29, 2010 fire, the residents of the Property were unaware of a safety plan or proper evacuation method. As a result, one resident was forced to jump from his apartment window and later died from his injuries.

35. Defendants' agents and employees were not present on the scene during the evacuation and no assistance or guidance was provided to the residents of the fifth floor, or specifically to Mr. P's family.

36. During the evacuation, A.P. (then 4 years old) was burned over approximately 35% of her body and she also sustained serious pulmonary inhalation injuries.

37. When A.P. arrived at Children's National Hospital on September 29, 2010, the date of the fire, she was screaming and crying uncontrollably, and in constant 10/10 pain because she had second-degree burns over most of her face and on her chest, abdomen, back, both arms, and both legs. She had circumferential burns to her left arm that appeared full-thickness and doctors were concerned for decreased perfusion to her left arm.

38. As a result of her inhalation injuries from the fire, her nasal hairs were singed, and there was soot in her nostrils and throat. A.P. was in respiratory distress and required intubation in the ER, as well as heavy narcotic pain medications.

39. On October 1, A.P. underwent a fasciotomy (a procedure which involves cutting the fascia to relieve tension or pressure to treat resulting loss of circulation) and a deep escharotomy of her left wrist (a procedure used to treat third-degree full-thickness burns where an incision is made through the entire thickness of the dead skin until subcutaneous fat is observed).

40. On October 2, A.P. was intubated and heavily sedated such that she was stable enough for transfer and was moved to Shriners Hospital for children in Boston, Massachusetts. There she

required norepinephrine support and was later weaned off as her Systemic Inflammatory Response Syndrome (SIRS)[1] response improved.

41. Because of her inhalation injuries, A.P. remained intubated for over a week at Shriners and was finally extubated on October 11.

42. As a result of the injuries she sustained in the fire, four-year-old A.P. was hospitalized for eight weeks, endured months of painful physical and occupational therapy, and was forced to undergo scores of surgeries and treatments in an effort to minimize the effects of her traumatic burns, scarring, and emotional trauma.




---

[1] SIRS is defined as "A serious condition in which there is inflammation throughout the whole body. It may be caused by a severe bacterial infection (sepsis), trauma, or pancreatitis. It is marked by fast heart rate, low blood pressure, low or high body temperature, and low or high white blood cell count. The condition may lead to multiple organ failure and shock." *See* https://www.cancer.gov/publications/dictionaries/cancer-terms/def/sirs.



43. A.P.'s father was also admitted to the Burn Intensive Care Unit at the Washington Hospital Center for severe burns and he was hospitalized for over two months.

44. Within weeks after the fire, A.P.'s mother, Mrs. A., died in the hospital due to the injuries she sustained in the fire.

45. In addition to the substantial injuries and treatment A.P. underwent in the year after the fire, she continues to see healthcare providers multiple times per year in an effort to improve the functioning and appearance of her heavily damaged, scarred, and disfigured skin. She will need to undergo treatment for the rest of her life. She will continue to incur future costs and expenses, including lost wages, for her treatment. She has also sustained substantial mental and emotional injuries because of the Defendants' negligence, which is a proximate cause of her injuries and damages complained of herein.

## **COUNT I – NEGLIGENCE**

46.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 45 above as if each were separately restated here.

47.     At all relevant times, Defendants had a duty to exercise ordinary care in maintaining the Property so as to keep safe common areas of the building. Further, Defendants, at all relevant times, had a duty to exercise reasonable care and diligence in inspecting, maintaining and repairing the Property to keep the building in compliance with local codes and to prevent conditions that could reasonably and foreseeably harm its residents, including A.P.

48.     Defendants breached their duty to exercise ordinary and reasonable care in their maintenance of the Property by, *inter alia*, failing to keep hallways and stairways clear from potentially hazardous articles, by disregarding local building codes and ordinances, and by failing to equip the building with adequate and operable smoke alarms and detection systems.

49.     Defendants breached their duty to exercise reasonable care and diligence in inspecting, maintaining and repairing the Property by, *inter alia*:

   a. failing to replace broken or inoperable fire and smoke alarms;

   b. failing to inspect the common areas such as hallways and stairwells for conditions that could reasonably and forseeably harm A.P.;

   c. failing to inspect for and remove extraneous and hazardous articles in the common areas;

   d. failing to maintain necessary fire safety systems in unit 506 of the Property;

   e. failing to promptly remove any extraneous or hazardous article in common areas;

   f. failing to enforce existing fire safety rules pursuant to the D.C. Fire Safety Code for the Property;

    g.  failing to adequately maintain the doorway of the Apartment, which allowed smoke to invade, thereby causing A.P. and her family to have to try to evacuate through the fire; and

    h.  failing to promptly repair the inoperable fire and smoke alarms.

50.    As a direct and proximate result of Defendants' negligence as set forth above, A.P. has incurred, and continues to incur, substantial damages including, but not limited to, severe physical injuries and pain; emotional distress; disfigurement and deformity, including any humiliation and embarrassment associated therewith; inconvenience; and past and future medical expenses.

51.    As a direct and proximate result of Defendants' negligence, A.P. is entitled to a monetary judgment in her favor and against Defendants to fairly compensate her for the losses, expenses and damages she has incurred, the exact amount to be proven at trial, plus interest.

## COUNT II – FAILURE TO MAINTAIN SMOKE ALARMS OR DETECTION SYSTEMS

52.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 51 above as if each were separately restated here.

53.    At all relevant times, Defendants had a statutory duty, as owners of dwelling units, to conform to the provisions of the D.C. Fire Safety Code as it relates to smoke detectors. D.C. Code § 6-751.01 *et seq.*

54.    Defendants breached their duty to conform to the DC Fire Safety Code by:

    a.  failing to maintain smoke detectors in a reliable operating condition; and

    b.  failing to make periodic inspections to ensure that the smoke detectors were in proper working condition.

55. As a direct and proximate result of Defendants' negligence as set forth above, A.P. has incurred, and continues to incur, substantial damages including, but not limited to, severe physical injuries and pain; emotional distress; disfigurement and deformity, including any humiliation and embarrassment associated therewith; inconvenience; and past and future medical expenses.

56. As a direct and proximate result of Defendants' negligence, A.P. is entitled to a monetary judgment in her favor and against Defendants to fairly compensate her for the losses, expenses and damages she has incurred, the exact amount to be proven at trial, plus interest.

## COUNT III – FAILURE TO MAINTAIN FIRE SAFETY PLAN

57. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 56 above as if each were separately restated here.

58. At all relevant times, Defendants owed a duty to A.P. to maintain in an operable condition all required fire alarm systems. D.C. Mun. Regs. tit. 14, § 904.1. Defendants also owed a duty to A.P., at all relevant times, to provide, install, and maintain therein proper and sufficient guide signs, guide lights, emergency and exit lights, including exit directional signs, hall and stairway lights, standpipes, required fire extinguishing equipment, and alarm gongs and striking stations. D.C. Mun. Regs. tit. 14, §§ 901.1, 903.1-.3.

59. Defendants breached their duty to conform to the D.C. mandated fire safety plan by failing to install and maintain proper or sufficient signage, lighting, extinguishing equipment, alarm gongs, or striking stations and by failing to maintain fire/smoke alarms/detection systems in an operable condition on the 5th Floor.

60. Defendants breached their duty to exercise reasonable care and diligence by failing to provide tenants with safety and evacuation plans in the event of a fire; failing to alert and warn

tenants that the building was on fire; and failing to provide agents, or employees on site during the emergency to assist tenants.

61. As a direct and proximate result of Defendants' negligence as set forth above, A.P. has incurred, and continues to incur, substantial damages including, but not limited to, severe physical injuries and pain; emotional distress; disfigurement and deformity, including any humiliation and embarrassment associated therewith; inconvenience; and past and future medical expenses.

62. As a direct and proximate result of Defendants' negligence, A.P. is entitled to a monetary judgment in her favor and against Defendants to fairly compensate her for the losses, expenses and damages she has incurred, the exact amount to be proven at trial, plus interest.

### COUNT IV – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

63. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 62 above as if each were separately restated here.

64. At all relevant times, Defendants had a duty to maintain its premises in a reasonably safe condition. Defendants had a duty with respect to the aforementioned premises to maintain it in a reasonably safe condition so that it would not present an unreasonable risk of harm to those lawfully on the premises. In violation of such duty, Defendants negligently permitted and maintained on such premises dangerous conditions that created an unreasonable risk of injury to individuals on the premises, including A.P.

65. As a direct and proximate cause of Defendants' negligence, and with no negligence on part of A.P. contributing thereto, A.P. suffered and continues to suffer severe mental pain and suffering, fear, inconvenience, nervousness, indignity, insult, humiliation, embarrassment, disfigurement and further psychological injuries.

66. The acts described herein constitute negligent infliction of emotional distress under the laws of the District of Columbia. A.P. is entitled to the recovery of compensatory damages in an amount to be ascertained at trial.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons stated herein, Plaintiffs demand judgment against Defendants, jointly and severally, in an amount to be determined by a jury, along with pre-judgment interest running from September 29, 2010, and her costs in this behalf incurred.

PLAINTIFFS DEMAND TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

          Respectfully submitted,

          RACHEL MERGENS and RAY ALVAREZ,
          as Guardians for A.P., a minor,
          By Counsel

/s/ *David W. Thomas* _____
David W. Thomas, Esq. (D.C.D. Bar No. 976513)
J. Gregory Webb, Esq. (VSB No. 38157) (pro hac vice forthcoming)
E. Kyle McNew, Esq. (VSB No. 73210) (pro hac vice forthcoming)
Anthony T. Greene, Esq. (VSB No. 95800) (pro hac vice forthcoming)
MichieHamlett PLLC
310 4th Street NE, 2nd Fl.
Charlottesville, Virginia 22902
(434) 951-7200 Telephone
(434) 951-7257 Facsimile
dthomas@michiehamlett.com
gwebb@michiehamlett.com
kmcnew@michiehamlett.com
tgreene@michiehamlett.com

Daniel Barrera, Esq. (D.C.D. Bar No. 445037)
Jose Caballe, Esq. (D.C.D. Bar No. 144617)
The Barrera Law Firm, PLLC
5845 Richmond Highway, Suite 620
Alexandria, VA 22303
(571) 290-2390 Telephone
dbarrera@barreralawfirm.com
jcaballe@barreralawfirm.com
*Counsel for Plaintiffs*